JAMES C. WALKER and JOHN R. SMITH, Appellants. *v.* JACOB HEDRICK, Appellee.

APPEAL FROM McLEAN.

Land which is a part of the alternate sections granted to the state, for the construction of the Illinois Central Railroad, is not subject to preëmption.

ON the 11th day of April, 1857, the appellants filed their bill in the McLean Circuit Court, setting forth the following facts, to-wit: On November 29th, 1855, Walker entered, at the land office at Danville, Illinois, the S. E. quarter of section 33, T. 22 N., of R. 3 E., in McLean county, which is the land in controversy, and obtained a certificate of purchase, and on February 22d, 1856, Walker conveyed by deed, to Smith, an undivided half of said land. The land in question, and all of said section 33, lies within less than six miles of the Illinois Central Railroad, and is one of the sections reserved to the United States by the act of congress, of September 20th, 1850, alternate to other sections granted to the States of Illinois, Mississippi and Alabama, in aid of the construction of a railroad from Chicago to Mobile. The final allotment of the alternate sections to the Illinois Central Railroad was made by the general land office of the United States, previous to June 4th, 1852. On November 27th, 1856, the appellee, Hedrick, obtained from the officers of the United States Land Office, at Springfield, Illinois (the land office within which the land in controversy is situated having, since the entry of Walker, been removed, by proclamation of the President of the United States, from Danville to Springfield), a certificate of purchase of the land in controversy, as a preëmptor, by virtue of a settlement made by Hedrick, on November 1st, 1855, on the said land, under the act of congress of September 4th, 1841, and that Hedrick has obtained a patent to the land as a preëmptor by virtue of his said settlement and certificate of purchase; and that said Hedrick is in possession of the land. The bill prays that Hedrick be compelled to convey the legal title which he holds under his said patent, to complainants, who are the owners in equity; for process to put complainants into possession; and for a decree quieting the title of complainants to the land; and for general relief. On the same day the bill was filed, the defendant entered his appearance, and filed a general demurrer to the bill; the complainants joined in demurrer, and upon the same day the court entered a *pro forma* decree, sustaining the demurrer, and dismissing the bill, from which decree the complainants appeal.

Appellants assign the following errors:

1st. The court erred in its decree at the March term, 1857, in sustaining the defendant's demurrer to the complainants' bill, and in dismissing said bill.

2d. The court erred in not sustaining the bill and granting the relief therein prayed for.

3d. The decree is erroneous in every respect, and should be reversed.

CORD, WILLIAMS and WALKER, for Appellants.

GRIDLEY and WICKIZER, for Appellee.

SCATES, C. J.   On November 29th, 1855, plaintiff, Walker, entered the tract of land in controversy at the land office in Danville.

After the office had been closed at Danville, and transferred to Springfield, on November 27th, 1856, defendant obtained a certificate of purchase from the office at Springfield, as a preëmptor, by virtue of a settlement made November 1st, 1855, on said tract, under the acts of congress of 1841 and 1853, a patent was issued to Hedrick; and Walker, with Smith, to whom he sold one-half the land, file this bill for a conveyance, and for possession.   The only question is, whether Hedrick was entitled to a preëmption in law, which would enable him to overreach plaintiff's prior entry?

I am clearly of opinion that he was not, and that the allowance of a preëmption was without warrant of law, and void.

It may be remarked that while the decision of the register and receiver upon the facts of settlement, cultivation, etc., is final, or only reviewable on appeal, yet their decision as to their jurisdiction of the case, or right of preëmption, is open to attack in any collateral proceeding before any court having jurisdiction of the property or parties.   *Elliott et al.* v. *Perisol et al.,* 1 Pet. R. 340.   "Yet if they undertake to grant preëmptions in land in which the law declares they shall not be granted, then they are acting upon a subject matter clearly not within their jurisdiction."   *Wilcox* v. *Jackson,* 13 Pet. R. 511; *United States* v. *Gear,* 3 How. (U. S.) R. 120, 802; *Brown's lessee* v. *Clements et al.,* ibid. 666–7.

By the 10th section of the act of congress of 1841, Sept. 4 (2 Purple Stat. p. 1340), a right to preëmptors is given, but it does not extend to, or include, "sections of land reserved to the United States, alternate to other sections granted to any of the states, for the construction of any canal, railroad, or other public improvement."   This land is on a section alter-

nate to sections granted to the State of Illinois, for the construction of the Illinois Central Railroad, and is reserved, in the sense of the term in that act, to the United States, and is not, therefore, subject to preëmption under that act.

The act of March 3, 1853 (2 Purple Stat. p. 1348), expressly extended the right of preëmption to the alternate reserved sections so excepted in the act of 1841. But this is restricted to certain persons : "no person shall be entitled to the benefit of this act, who has not settled and improved, or shall settle and improve such lands prior to the final allotment of the alternate sections to such railroads by the general land office."

This is in a proviso, but it effects the same modification of the right of preëmption granted, as if wrought into the frame of the granting clause. If the granting clause were thus modified and made to embrace in it, the substance of the *proviso*, it would then read, substantially, that every person who *has* settled and improved, or *shall* settle and improve, any alternate section of land along the line of railroads, reserved to the United States from the grant to the states for such roads, and which has been, or shall be so settled and improved, "prior to the final allotment of the alternate sections to such railroads by the general land office," shall be entitled to preëmpt the same, if payment therefor shall be made "at any time before the same shall be offered for sale at auction."

The facts of settlement and improvement must be made before a certain day — that is, before the day of final allotment of the alternate sections to the railroad; the day of payment is an extended day, the day fixed for the sale of the lands at auction. But it is impossible to construe the act in such sense, as to allow this clause extending the time of payment to the day of sale at auction, to carry forward to that day, the acts of settlement and improvement. For by such construction, the clause requiring these acts to be done before the final allotment of alternate sections to the railroad, would become inoperative and null. Beside it is manifestly against the plain sense of the whole act. It is plainly qualified and confined as a right to acts of settlement and improvement made prior to the day when the sections of the granted lands is confirmed and alloted to the railroad. No settlement and improvement made after that day will confer any such right.

That allotment was made, as is shown in the record, on the 4th day of June, 1852. Defendant's settlement and improvement was made on the 1st day of November, 1855, more than three years after the expiration of the time, in which such acts could be made to confer that right, as fixed by the act.

The second *proviso* conferred a general right of preëmption under the provisions of the act of September 4th, 1841, which

Walker *v.* Hedrick.

allows, indefinitely, future acts of settlement, proof and payment for lands not reserved. But this is here confined to lands "heretofore reserved on account of claims under French, Spanish or other grants," which have, or thereafter may be declared invalid by the supreme court of the United States. This tract is not shown to be of that character—else the settlement would be good.

It appears, by the date of the certificate of purchase issued to defendant, that he did not pay for the tract within twelve months after the date of his settlement, which was the 1st of November, 1855, and his payment and certificate are 27th of November, 1856. The fifteenth section of the act of 1841 requires the payment to be made within twelve months. I presume the land officers would have no jurisdiction to extend the credit, but admit that the fact and time of payment are within and concluded by their decision, and are not questions of jurisdiction, reviewable collaterally; yet it is very clear that they cannot extend the time of *making* settlement and improvement beyond the day of allotment. To do this, would be to make the act a general one, and open these lands indefinitely to future preëmptive settlement, at any time before their actual sale. An attempt to embrace such settlement and improvement within the provisions of this act is clearly without the jurisdiction of the land officers, and cannot divest the right and title of a fair purchaser.

There being no right of preëmption in the defendant on the 29th day of November, 1855, by reason of settlement and improvement, made on the 1st day of that month, the plaintiff, Walker, acquired, by his purchase, the title, or right to the title, in fee of United States, and no sale by the agents of the United States, subsequent, was authorized by law. It is simply void.

But as the legal title has been conveyed by patent to defendant, and a patent withheld from plaintiff, Walker, a court of equity will treat him as trustee of the title, and compel him to convey to plaintiffs, who have a prior and superior equity. 2 Story Eq. Jurisp., Sec. 602; 13 Ill. R. 190.

Decree reversed, and cause remanded for decree, in conformity to this opinion.

*Decree reversed.*

CATON, J. It seems to me that this whole case depends upon the meaning to be attached to the word *reserved* in the tenth section of the preëmption law of 1841. The lands excepted by that section from the operation of the law were designed to remain entirely, and forever, unaffected by it, as much so as if they had been described by their numbers.

Unlike all previous preëmption laws, this was a continuing and perpetual act, and so was the exception designed to be continuing. No future event is alluded to which should suspend the operation of the exception, and allow the body of the law to operate on the lands thus excepted. As to those lands, the law was designed ever to be a dead letter, or inoperative. They were, and were to continue, the same as if the law had never passed. To me it seems repugnant to the language of the act, and the manifest intention of congress, to say that the exemption was designed only to continue till the reserved lands should be again brought into market. Although it is understood that such has been the construction of the department of the interior, and that, under such construction, this preëmption was allowed, neither of us can find any warrant in the language, or the policy of the law, to justify such conclusion.

The question then recurs, were the sections alternate to the sections granted to the State of Illinois, to aid in the construction of the Illinois Central Railroad, "reserved to the United States," within the meaning of the tenth section of the law of 1841? The language of the grant is: "Every alternate section of land designated by even numbers, for six sections in width, on each side of said road." Although this act does not, in terms, reserve to the United States the sections alternate to those granted, yet such is its inevitable legal effect. Had the words "reserving the other alternate sections to the United States," or, "reserving to the United States the sections within the same limits, designated by odd numbers," the legal effect would have been precisely the same. In both cases, the even sections within the prescribed limits would have been granted to the state, and the odd sections would have been reserved from the grant, or, in other words, would continue in the United States. This was the effect, and nothing more, in the case of the grant to the State of Indiana, to aid in the construction of the Wabash canal, in which the word *reserved* was used. An examination of all the acts of congress granting alternate sections of lands to states, to aid in the construction of internal improvements, will show that the word "reserved" or "reserving" has been sometimes used, and sometimes omitted, but its use has been rather accidental than designed, and that, whether used or not, the effect of the law has been precisely the same. In every case the title to each alternate section is granted, and the title to the sections alternate to those granted remains in the United States. Nothing more, and nothing less.

Now it seems to me clear that it was the intention of congress to embrace within the exception contained in the tenth

section of the act of 1841 all such alternate sections, the title to which remained in the United States, after the passage of the granting act. The language of the exception is of "sections of land reserved to the United States, alternate to sections granted to any state for the construction of any canal, railroad, or other public improvement." I think the word *reserved* here is not used in the technical sense which is sometimes ascribed to it in common assurances, but is a simple mode of description, and was simply designed to express the intention of congress not to allow preëmptions upon those lands which were alternate to sections granted to states for the purposes specified. The words "reserved to" have, in this case, precisely the same meaning as would the words "not sold by," in the same position in the section.

That congress considered the alternate sections, not granted by the act of 1851, as *reserved* sections within the meaning attached to that word, when used in this class of legislation, is rendered perfectly clear by the act of 1853, granting preëmptions to a part of those very reserved lands. 10 U. S. Stat. at Large, p. 244. There these very lands are, in express terms, called *reserved* lands, and unless these lands were excepted out of the operation of the preëmption law of 1841, congress was doing a very useless and foolish thing, in making very limited provisions for preëmptions on these lands, when the general law of 1841 was applicable to them, whereby all were liable to preëmption by any one who should settle upon them. It is true that this may be said to be but a legislative construction of the act of 1851, and were it clearly repugnant to the manifest meaning of congress when they passed that act, could not control in its judicial construction; but, in this case, I think it is entirely consistent with the original intention of that act.

I think the demurrer to the bill should have been overruled, and concur in the judgment proposed by the Chief Justice.

SKINNER, J., DISSENTING. Congress, by an act, approved September 20th, 1850, granted to the State of Illinois, for the purpose of aiding in making the railroad known as the "Illinois Central Railroad," "every alternate section of land designated by even numbers, for six sections in width, on each side of said road," and a quantity of land, equal to so much of such alternate sections as should appear to have been, prior to the making of the grant, sold by the United States, or to which the right of preëmption had attached, to be selected, by the State of Illinois, in alternate sections, or parts of sections, from other lands of the United States, within fifteen miles of the line of said road, reserving from the operation of the act

"all lands reserved to the United States by the act entitled, '*An act to grant a quantity of land to the State of Illinois, for the purpose of aiding in opening a canal to connect the waters of the Illinois river with those of Lake Michigan;*'" and fixing the *minimum* price of the sections of land remaining to the United States, within six miles of the line of the railroad, at double the ordinary *minimum* price of the public lands. Laws of Congress 1850, p. 466.

The complainants claim that the title of defendant, based upon his settlement and entry, made under the preëmption law of 1841, is subject to a prior equity in them, by virtue of an entry of the same land, under which they claim, made subsequent to his settlement, and prior to his entry.

The ground assumed by the complainants is, that the land, being within the twelve miles in width on the line of the road, and of the alternate sections not granted to the State of Illinois, is not subject to preëmption under the law of 1841, and, therefore, that the allowance of the preëmption claim of defendant was without jurisdiction, and void.

The preëmption law of 1841 excepts from its operation the "sections of land reserved to the United States, alternate to other sections, granted to any state for the construction of any canal, railroad, or other public improvement." United States Statutes at Large, Vol. 5, p. 455, Sec. 10.

At the time of the passage of this law, several grants of lands, in alternate sections, similar to the grant of 1850 to the State of Illinois, had been made by congress to states for purposes of public improvement; but, so far as I have been able to discover, the laws making those grants expressly reserve "to the United States" the sections of land alternate to those granted. U. S. Statutes at Large, Vol. 4, p. 234; ibid. p. 236.

Under such special clauses or reservations, I render the course of decision of the offices of the federal government, having jurisdiction in the matter of the disposition of the public lands, to be, that while the lands remain out of common market, by force of the reservation, they are not subject to preëmption under the law of 1841, but that, when restored to the mass of the public lands, and subject to private entry, they become subject to preëmption under that law.

The law of 1850 simply grants to the State of Illinois the alternate sections within the named limits, and contains no words of reservation whatever, except as before stated, leaving the lands within the same limits, not granted, unaffected, except as to the *minimum* price; and leaving unchanged, in any particular, the lands of the United States, alternate to those to be selected by the State of Illinois, without the mentioned limits, and within the fifteen miles of the line of the road.

There is nothing in this law, or stated in the bill, which shows that the land in controversy was in any manner reserved or taken out of the mass of the public lands, or not subject to private entry, at the time of the defendant's settlement and purchase as a preëmptor; and, indeed, the complainants claim under purchase at private entry, made after the defendant's settlement. It cannot be said that the mere granting the alternate sections to the State of Illinois, or to any one, amounts, in the sense of the law of 1841, to a reservation of the other alternate sections not so granted, from the operation of the preëmption laws, or from private entry. It is self-evident that what is not granted or sold of the mass of the public lands remains to the United States, as common proprietor, but remains unaffected by the grant or sale of a part, and subject to disposition, under the laws, the same as before.

It is not contended that the lands remaining to the United States, without the twelve miles in width, on the line of the road, alternate to sections selected by the State of Illinois, in lieu of lands within those limits, prior to the grant sold by the United States, or to which the right of preëmption had attached, are not within the operation of the preëmption law of 1841; and yet the only difference between the lands so remaining to the United States, within and without those limits, is, that in the one case, the *minimum* price is increased to two dollars and a half per acre, while, in the other, it remains at one dollar and a quarter. Nor am I able to discover that the grant, except as stated, affects the disposition of· the lands remaining to the United States, because not granted, alternate to those granted, any more than if the lands so granted had been sold at public sale, or private entry. In view of the uniform policy of congress, in encouraging settlement and improvement of the public lands, evinced by the various preëmption laws, it would be difficult, in the absence of express provision, consistent with that known policy, to find a reason why lands once exposed to public sale, and open to private entry, at a fixed *minimum*, should not, and are not, subject to preëmption entry, at the same *minimum* price.

It is apparent to me, from the record and the course of the argument, that there is no real litigation between these parties, and that both seek the same decision in this court, probably for ulterior purposes. A majority of the court, however, feeling bound to adjudicate upon the record, I give my views on the case presented. I think the decree sustaining the demurrer to complainants' bill should be affirmed.